Case number 23-5186. Kaitlyn E. O'Hare, appellant, v. Martin O'Malley, Commissioner of Social Security. Ms. Benna for the appellant. Mr. Littman for the appellee. Good morning. My name is Christine Benna. I'm here today representing Kaitlyn O'Hare. We want to emphasize just two points quickly. We're asking you to find Ms. O'Hare disabled, but we're not asking you to weigh evidence. You won't, so I don't. With controlling physician's orders and opinions and uncontradicted sworn testimony, Ms. O'Hare has established her disability as of December 8, 2012, by law. It's uncontested that she collapsed at work on December 8 and that there were uncontested doctor's orders and an unsuccessful work attempt until about mid-March of 2013. Well, you said there were uncontested doctor's orders, but I think the order you're referring to said until further consultation, a few days. I'm referring to the very first ones when she went to the hospital and she was in and out, and they just wrote she's in and out. I'm not talking about the ones that are contested later. You say in your brief that she was ordered to stay in bed for an extended period, but I don't see the order saying that. You don't see, I'm sorry? I do not see an order so directing her. Oh. No, no, no. There's not an order directing her. The only thing that is in paper. Well, you say in your brief on page three of the reply brief that she was disabled from March 2013 until May of 2014 under doctor's orders because her primary care physician ordered her to stay on partial bed rest for 14 months, but the cited document from Dr. David ordered her until further medical evaluation can be completed, which does not support an order to stay on bed rest for 14 months. Yes, ma'am. That's entirely correct. There are a series of communications with her employer, and they're not, I'm afraid in the official record, they are not in order, but it's back and forth. She's still on bed rest, and her doctor is communicating, but it doesn't matter very much how long that went on because about two weeks later, after she was put on partial bed rest by Dr. David, her primary care physician, she saw a cardiologist, and the cardiologist, according to her, I'm sorry, her cardiologist advised her to elevate her legs to relieve the blood pooling that was going on in her feet, and that was her uncontradicted testimony. His notes for that date also reflect a discussion of therapeutic options for which this would have been one. The other, of course, would obviously have been the compression stockings, but his orders were never rescinded. Which doctor are you referring to and what page are you referring to? I believe it is Joint Appendix 292, ECF 17.9 at 7. I don't know which doctor that is, I'm afraid. I believe that's one where there's also present an intern or something. But I believe it's at 292. You said you had two points? Oh, he just talks about discussed therapeutic options. He doesn't list them. But this is compression stockings and elevating your feet above heart height are standard advice for people with postural orthostatic hypertension. I'm sorry. Absolutely, yes. So I think one of the key things you relied on for the argument that she needed to elevate her legs is Dr. Solomon's final note. And what the ALJ says is first, he's very careful in that final, sorry, not his treatment note, but the medical source statement. He's careful to note that this is per the patient. And second, he says it seems to be contradictory to Dr. Solomon's own earlier last treatment note in November 2015. Why are those two points incorrect? I always have trouble with his ideas of contradiction because, as you just stated, they're months apart or weeks apart. Sick people don't stay the same, especially when it's one where her posture changes her blood pressure. I absolutely appreciate that. And I think what the ALJ was saying is the last treatment note from Dr. Solomon is in November 2015. And that's the last time that he had seen her. And that it seems it doesn't say anything specifically that she doesn't need to elevate her legs, but it is otherwise a very positive report on her status. And that if he did not then see her again and his final note says she needs to elevate her legs per patient, that ALJ had some reason to not give that full weight. And the question before us is why is that an unreasonable conclusion? A couple of reasons. First of all, he's a treating specialist, as you know, and that means that he, and he has been in communication with her on and off all along. And so he already gets under Rule 1527C, he gets three points, if you will. Of course, she changes, her condition changes, not position, condition changes. And at that time she had improved. Then again, she relapses. She does improve periodically throughout this period, of course, but she also relapsed every time. And in fact, in here she relapsed to the point that she needed home health aid. You referred to a doctor, a treatment record showing that somebody had directed, I think it was Dr. Solomon, but somebody had directed her to elevate her legs. I don't recall seeing that. What page are you looking at? That is the only place that will appear in the record in clear terms, the way you're talking about it, Your Honor, is at the very end. Can you give me a page? There's just a lot of... They're doing the... I'm not sure they ever actually say it. They say she needs to elevate... He says she needs... He who? Dr. Solomon? Dr. Solomon, same doctor. He says that she needs to elevate her legs when symptomatic. Yes, this is on page 618 and 619 of the Joint Appendix, and that's the document I was asking about. In particular, the ALJ pointed out, every time he says that she needs to elevate her legs, he's careful to say her patient. Right. And one of the important things here is that he actually noticed in there that it's clinically supported by her tachycardia and tilt table testing. But in addition, he also got emails from her two or three times a month because her blood pressure fluctuated so dramatically. Thank you. Thank you. Did you save any time for rebuttal? I did. Five minutes. Okay. Now we'll hear from Mr. Lippman. Thank you, Your Honors. Jared Lippman for the United States of America. May it please the court. I want to start by confirming a few things that the court pointed out. First, Judge Blard, you're correct. There's no order directing the plaintiff to stay in bed for 14 months. All we have is the March 2013 opinion submitted by Dr. David, which actually suggests a period of bed rest for maybe two to 12 weeks. And that was because she wasn't treated at that time. What the record showed is once she was treated with that medication, her symptoms began to dissipate and her problems began to lift. So you're right. There is no document about her having to stay in bed for 14 months. Secondly, Judge Garcia, you're correct. Dr. Solomon's opinion was overtly per patient. Dr. Solomon indicated right on the face of that when those limitations were per patient. So you're exactly correct there that those were subjective self-complaints. So I have a question about that because most of the diagnostic work that I think doctors do is based on information. And obviously, lab tests and physical examinations and are incredibly powerful diagnostic tools, but a lot of information that is relied on by doctors is patient self-report. Can you help me out in understanding why dismissing something as self-report is not deeply problematic? A few things. First of all, it wasn't dismissed purely on that basis. The ALJ correctly pointed out where Dr. Solomon made notations that the limitations were per patient. And under the regulations, an ALJ can discount medical opinions for two reasons. One, if there's no supporting laboratory or diagnostic testing, or if it's inconsistent with the evidence of record. So yes, of course, what you report to your doctor is relevant. I mean, it does mean something. But in terms of giving a medical opinion controlling weight, it has to meet certain standards to be entitled to that controlling weight. So here, is it that it's inconsistent with lab tests or that it's contradicted? There is, with respect to like the elevation of legs, for example, that was one of the notations that were per patient. What the ALJ pointed out is there's nothing in the treatment record. One where plaintiff reported that she needed to elevate her legs in all that time when she's going to a doctor. She reported that to Solomon. She reported that to Dr. Solomon at the time. Who was a treatment doctor. We indicate that in the statement, but nothing in the treatment records. So she never told during the portion of the treatment evidence, she never said, the doctors, I need to elevate my legs because I have swelling. That makes them feel better. What we do have is her doctors were saying, because of your symptoms, you should wear compression stockings. That should be sufficient, that conservative treatment. And it's proved out that it was. We don't have anything from her doctors in the treatment records saying, if you experience swelling in your legs, to elevate them. They told her to wear compression stockings. You can go exercise and do yoga is the message that they were telling. Her argument is that that's not actually contradictory evidence. It's just evidence that doesn't speak to the question. And so it seems to me that you need us to think it's reasonable to read a treatment note that just doesn't mention one way or the other, a need to elevate your legs as contradictory to Solomon's later statements. And so what's the argument that we should do that? I mean, I think it's certainly, you know, everything has to be factored in. The judge is looking at this entire record and hear the fact that it was never reported to her doctors that she needed to elevate her legs. And second, that her doctors never instructed her to elevate her legs. Something that the ALJ can consider when looking at that medical statement, you know, further down the line saying per patient, she needs to elevate her legs. You'd expect to see that, you know, in the record. And Dr. Solomon, it wasn't just the per patient notations. The ALJ also spoke about Dr. Solomon only saw a plaintiff four times over the course of several years. That's not the type of longitudinal treatment evidence that sometimes you would see that really underlies the treating physician rule. So four times over the course of a couple of years and important. But she was in contact with him in between quite frequently by email. I think those emails came towards the latter portion of the disability period more in, I think, late 2015 and 2016. So, but the in-person examinations, which is a big portion, we're talking about a cardiologist. So testing, of course, is an important component of that. Dr. Solomon saw her only four times. So that's another piece of this. It's in addition to a lot of the notations being per patient. Only saw her four times. And the ALJ didn't stop there. The ALJ pointed out, and Judge Garcia, you mentioned this, in the last treatment note from Dr. Solomon, which was only five months prior to the statement, Dr. Solomon did do an examination and did make notations saying that plaintiff dramatically improved on her medication. She was doing very well from a cardiac standpoint. She had no chest discomfort, no shortness of breath on exertion, no palpitations, no fainting, and no swelling. And that's on page 736 of the joint appendix. Your brief acknowledged that Ms. O'Hare was quote, almost completely immobile, close quote, for a year and a half. And then you proceed to say that her symptoms began to respond. But how does beginning to respond, that her symptoms begin to respond, undermine her having been on bedrest for a year and a half? I don't believe that we conceded that she was on bedrest for a year and a half. I think that was a contention of plaintiff. She was most certainly not on bedrest for a year and a half. What we have, the timeline was in December 2012 is when she had that first incident at work and she went to the hospital. In March 2013, she made an attempt to return to work. That attempt was unsuccessful. That was light, semi-skilled work. She was working at a boutique in Bloomingdale's. So you talk about Dr. Solomon's report that she had been almost completely immobile, but then she had stopped fainting. You say the ALJ doesn't credit this. To the contrary, the ALJ treatment note reflects that her symptoms began to respond to medication. I seen you say in 2013, how do we know how, I mean, beginning to respond can be slight, it can be moderate, it can be obviating all symptoms. Beginning to respond is, I mean, I had a bunch of questions, I guess, about the use of something being controlled, something being improved, responding. It seems like every time there's any improvement, one way of reading the ALJ is that that meant it was better. It was better not in the relative sense. It was resolved. Any light that you can show on, that you can throw on that? Yeah, I understand your point, Judge Pillard, but when I read the ALJ's decision, I don't think the ALJ discussed improvement in a vacuum. If you look at the ALJ's decision, for example, on page 50 of the joint appendix, this is part of the ALJ's decision, what the ALJ said was plaintiff's POTS improved dramatically, right? In a vacuum, that doesn't tell you much, you know, what does that mean? But the ALJ does not stop there. The ALJ says plaintiff's POTS improved dramatically on 4NF and midragine, and then the ALJ went on to say, oh, back to baseline, she had stopped fainting. So the ALJ always added context to when he said that plaintiff was improving. Similar with respect to plaintiff's headaches. This is on page 51 of the joint appendix, also the ALJ's decision. The ALJ said that on medication, plaintiff's headaches were well controlled. I think you're right, Judge Pillard, in a vacuum, that doesn't give you much, necessarily much information. But then what the ALJ went on to explain, that plaintiff experienced only one episode of her headaches over the course of several months. So always adding some context to what those words mean. One of the things that I found difficult about this case is there does seem to be some amount of over-claiming, and then the ALJ is responding to that. For example, in the headache paragraph that you're talking about, the medical evidence does not support her allegations regarding intensity, persistence, and limiting effect. And, you know, it's under control, but then she sometimes is fluctuating. So, you know, the medical record does not support her, but it seemed like she was still, like, it's unclear that the medical, the treating physicians seem to be saying she's still got some pretty substantial impairments to contend with. And so taking it down from her level of report, I'm just not sure what to make of that. And that's how I read the ALJ to be using that as a benchmark and saying it was less than that. What the ALJ does, one of the components of the ALJ's decision is they need to look at the plaintiff's subjective complaints, and then they need to compare that to the medical evidence in the rest of the record to see whether it lines up with her allegations as to the persistence of the problems, as to the severity of the problems, and as to the degree of her problems. And that's exactly what the ALJ did here. And we need to remember it wasn't that the ALJ said, you know, no, Ms. O'Hare, you're fine. You can go back, you know, to go work, you know, a medium job or heavy job. We're talking about a functional capacity of light work, and the ALJ identified sedentary, unskilled jobs with a sit-stand option. That's the lowest level of work available under their commissioner's regulations. So the ALJ didn't say, you know, you don't have, no, you don't have problems. The point was, evidence doesn't support your allegations that you're making, and the medical evidence supports a functional capacity of finding of sedentary and light work. If we hypothetically thought that ALJ's decision was only reasonable as to the sedentary work finding, would we still be denying, affirming? Yes, Your Honor, you would affirm in that circumstance. Anything else, Judge Rogers? Yes, I just have one question. You know, counsel, in the opening brief, there is an attempt to summarize. And basically, it was reflected in the oral argument today. Is this, is a woman who's 27 years old, and yet she has conditions that suggest she's impaired to a far greater extent than would a healthy 27-year-old person. So what's happening? So her record says she has these problems. They're multiple problems. And when they all gang up on each other, she's impaired. But with medication that helps some, she improves in that area. Likewise, with these stockings, some exercise, she might improve in some other areas. But then the record shows she has relapses, where these conditions come back. So the way I read this record, and what the ALJ is saying is, this is a person who throughout her life is going to have these episodic occurrences that will in effect, and I'm not using this in a technical sense, disable her from working productively, except in the most sedentary, non-demanding jobs. And that's enough under the law and regulations to find that she is disabled for purposes of medical insurance coverage. Is that basically the position in this case? Yes, Your Honor. A couple of points I want to make here. First, you don't have to be pain-free or symptom-free in order to be able to return to work on a regular basis, particularly here when we're talking about sedentary work. There's a lot of people who go to work on a daily basis that are experiencing some level of symptoms. The ALJ's point here was that the symptoms when treated, which they were in medication, did not reach the point of disability. Remember, this is a pretty strict standard here. It's someone who for a period of 12 consecutive months, not just can't return to her past relevant work, but can't return to any job available in the national economy. And that's the decision that the ALJ made. One other point I want to make, Judge Rogers, is the ALJ didn't ignore or disregard that at times symptoms return. The ALJ addressed that head on. And if you look at page 50 of the appendix, the ALJ says, although the claimant reported increased symptoms at times, her symptoms improved quickly with medication adjustments. So what the record shows is that plaintiff would be stabilized at her medication. At some time, she came back and reported, hey, I had a spike in my symptoms, doctor. What should I do? And doctors always responded accordingly, and those symptoms dissipated again. So the ALJ recognized those what can be called recurring symptoms that would pop up once in a while. But in every one of those circumstances, her doctors responded with a medication change or just a dose change, and those symptoms quickly alleviated again. So, Mr. Lippman, does controlled mean eliminated or virtually eliminated as a medical matter? I wouldn't consider controlled a medical term. I think what controlled... You would not? Excuse me? You would not consider it a medical term? I mean, we see it in medical records all the time. I'm not sure if there's a medical definition attached to it. I think it's the common understanding of controlled. I think it means that the symptoms have remediated to the point that it's not a significant interference in performing daily activities. So, for example, on... This sort of combines the two concerns I have, that the ALJ is taking aim at the claimant's description and finding the claimant's descriptions to be higher, of worse impairment than the record would show. And the ALJ then is also looking at reduced symptomology. Neither of those things actually, logically to me, seems to speak to the objective degree of impairment and the ability of the person to do work. And I'm looking at the, I guess it's the third full paragraph on JA-52. Claimant alleges... A couple sentences into it. Claimant alleges she is able to walk on 10 minutes, stand 5 minutes, sit without her legs elevated for 20 minutes, and lift 5 to 10 pounds. The objective medical evidence and the claimant's own reports to her treating sources fail to severity and degree of limitation, she now alleges. Which in my mind raises the question, well, what degree does it support? The medical record shows the medication has been effective in reducing and ultimately controlling most symptoms. Not all symptoms. And physical examinations have generally not revealed significant abnormalities. What about the significant abnormalities that are revealed at the medical appointments? And then the ALJ acknowledges that she has chronic fatigue syndrome. So that's reasonably expected to make her exhausted. I'm just not sure what's going on when I read that. I think there are a couple points. First of all, again, someone doesn't have to be symptom-free in order to be found not disabled. There still can be symptoms. And what the ALJ did, the ALJ made these statements, but then went through the medical evidence and discussed what those treatment notes from Dr. Solomon, the cardiologist, and what the rheumatologist said, that didn't support the extreme limitations that plaintiff was stating. And remember, we're talking here about sedentary work. So the ALJ, in fact, credited plaintiff to a pretty extent. I mean, sedentary work is the lowest level of work under our regulations. The ALJ didn't have to defer to what plaintiff was saying or what she testified about. The ALJ assesses that against the medical evidence and reduced her to sedentary, unskilled work with a sit-stand option. And the one other point I want to make, and it hasn't come up in my argument somehow, we're talking about the substantial evidence standard here. And that's absolutely critical in looking at this case. And under the substantial evidence standard, the evidence would have to be so strong that it would compel different factual findings. Just because some evidence might support a different factual finding doesn't mean that the court should remand on that basis. So long as substantial evidence that's more than a mere scintilla of evidence supports ALJ's decision, then the court should affirm. Also under that standard, the courts can't reweigh the evidence. And the majority of what's being said here is a request for the court to reweigh the evidence, which isn't permitted under substantial evidence of review. And the consultative physicians are people who look at the records. They don't meet with the patient, right? So there's two different types of doctors here. There's a state agency consultant, and those were the ones in February upon initial review. And I believe April of 2014 upon reconsideration, those doctors are just looking at the medical records. There's also something called a consultative examiner. And here we do have one, Dr. Wangard, looked at plaintiff's legimental limitations, and that is someone who actually did examine plaintiff. Thank you. That's helpful. Other questions? There are no more questions from the court. We ask the court to affirm substantial evidence supports ALJ's decision. Thank you. Pardon? We have no time remaining. We'll give her a couple of minutes. Just a couple of quick points. Dr. Solomon is a private doctor. He is not an agency doctor, so he doesn't tell you everything. They write down what they think is important. They also, because they're members of the GW Medical Associates, they see each other's records. So they see all of her tests, examinations, everything. Now, one of the reasons you're having your questions, I realize, is that the judge failed to put in the required function-by-function analysis. So Social Security Ruling 96-8P and 404-1529C talk about the function-by-function analysis, and it's missing here. The regulations require an evaluation, not, oh, she's generally improved. She does this generally. That should be a number. The function-by-function analysis actually requires the ALJ to evaluate the restrictions and the treatment, their frequency, their duration, and gauge their severity. And that changes, in this case, over time. But he gives the impression that she's always improving. Well, she's always improving. Why is she sitting at home with her legs elevated? Why is she still going to the doctors? Now, her testimony was that she elevated her legs, and that means you can't work at a desk. If you elevate your feet to heart height, you cannot work at a desk. You can't reach it. She says she elevates her feet most days, most of the time. Most of the time on most days, I have it backwards. She is not bedroom. She can go to the doctor. She can go out to lunch. But for several hours of the day, most days, most of the time, she has to have her legs elevated. And that's the critical core of this case. Yes, she had periods of improvement. But also, what would happen is her blood pressure would better, but her migraines would go up. She would take her migraine and depression medication, and her blood pressure would go up. And that's in the record as well. Also, the ALJ here failed to quantify, and this is required and discussed in Social Security Early 96-8P, you have to quantify separately each of the seven strength demands, sitting, standing, walking, lifting, carrying, plus manipulative functions, mental functions, postural functions. That's missing and totally missing here in this decision. It's just also, what's missing is what happened to Butler. But it's a very poor decision, and it's very difficult. I understand that. But there has to be a function-by-function analysis, or you don't, or just as you are having trouble, you can't tell what he thinks about what her condition was one year versus the next Tuesday, or it's, I wish it were more clear. Well, I actually don't, but that's what's missing. And you can, it's in 404-1529C, but it's expanded, of course, and discussed more thoroughly in 96-8P. And that's why you can't tell when she improved or, critically, how much. You can't tell when she relapsed and how, because there's no, it's effectively no timeline is one way to think about it. Where, what are you pointing to as requiring a function-by-function analysis? Because I don't think our court has held that that rule. Social Security ruling 96-8P, it discusses how to, the judge is supposed to develop the residual functional capacity. It's also discussed, Your Honor, at 404-1529C. And you did not include in the appendix the Social Security ruling that you're talking about? 96-8P. Yeah. I have a spare copy. All right. We can look it up. And the other thing you're pointing to is? Oh, in the ruling itself. You also referred to, is it 20 CFR 416-945? Is that what you were referring to? I'm sorry? 416-945? Yes. All right. Any questions? Judge Rogers, any further questions? No, thank you. All right. Thank you very much. The case is submitted.
judges: Pillard; Garcia; Rogers